Carswell *vs*. The Macon Manufacturing Company.

WILLIAM E. CARSWELL, plaintiff in error, *vs*. THE MACON MANUFACTURING COMPANY, defendant in error.

1. The Constitutions of 1861, 1865, and 1868, requiring cases in equity to be brought in the county where one of the defendants, against whom substantial relief is prayed, resides, does not apply to bills ancillary to suits already pending, which, for purposes of injunction, etc., may be brought in the county where such suits at law or equity are pending. When, however, the bill prays independent relief, not necessary to an adjudication of the matter involved in the original suits, the bill, as to that independent relief, is demurrable.

2. When an action was pending in Bibb Superior Court, in favor of a plaintiff, who resided in Wilkerson county, and the defendant filed a bill in Bibb, charging that the note sued on was given for two hundred and fifty bales of cotton, which the plaintiff had, by fraud and deceit, induced him to buy, but which, the day after the sale, was seized by the military authorities as Confederate cotton, and, by them sent out of the State, against the complainant's consent and efforts, but which he had followed to New York, and brought his action therefor in the United States Court, and had given notice of the action, which was still pending, to the vendor, and the bill prayed an injunction of the common law suit until the termination of the suit in New York:

*Held*, That the bill was properly filed.

3. In such a case, the Judge may grant a temporary injunction, leaving to the defendant his right to answer and move to dissolve, and to have such other proceedings taken as are usual in Chancery.

Equity. Injunction. Demurrer. Decided by Judge COLE. Bibb Superior Court. June Term, 1868.

On the 24th of February, 1856, the Macon Manufacturing Company, a corporation, bought of Wm. E. Carswell, of Wilkinson county, Georgia, two hundred and forty-eight bales of cotton, at the full market price, thirty-five cents per pound. They bought it to manufacture. They paid him $7,500 00 in cash. The cotton was then in the warehouse of Hardeman & Sparks, in Macon, Georgia, and, after the purchase, it was delivered to the company, and shipped to its warehouse. Said cotton, (according to the information and belief of the company), was, in the fall of 1865, by ———, representing himself as an agent of the treasury department of the United States, seized, as the property of

the government, and, after being sometime in controvery, was released, and remanded to the possession of said Hardeman & Sparks, as bailees of Carswell. So it remained till February, 1866.

Before the sale to the company, it was again seized by one Clifton E. Wharton, as treasury agent of the United States, who, (as the company is informed and believes), claimed it by title paramount to Carswell's title. After some real or pretended investigation, Wharton released it on the 23d of February, 1866. This last release was procured by fraud, and by a bribe, paid by Carswell. The release was in two papers, in writing, signed by said Wharton, as such agent, and dated 23d February, 1866, as follows:

"Permission is hereby granted Messrs. Hardeman & Sparks to ship (254) two hundred and fifty-four bales of cotton, present shipping marks, W. E. C. & William E. Carswell, it having been shown that the above cotton is not the property of the United States Government," and "The embargo, placed upon the (254) two hundred and fifty-four bales of cotton belonging to William E. Carswell, is this day raised."

The company believed said release was *bona fide*, and supposed they were getting a good title to the cotton. Indeed, one of the directors of the company told Carswell, at the time, that they would not buy it unless the title was all right. After the company got possession under said purchase, one H. B Titus, claiming to be the special agent of the United States treasury, siezed said two hundred and forty-eight bales of cotton, as the property of the United States, and one Bogart, then commandant at Macon, ordered a squad of negro soldiers, of the United States army, to deliver the same. They arrested the President of the company, because he would not deliver the cotton, broke open the warehouse of the company, and violently took it. These United States agents shipped two hundred and forty bales of this cotton to Savannah. Said President went to Savannah, and obtained an injunction from the Superior Court of Chatham county, against the removal of the cotton. The military authorities at Savannah, disobeyed the injunction, and shipped the cotton to New York.

When it landed in New York, it was attached at the

instance of the company, as their property.   Thereupon, one Simeon Draper, as an agent of the United States, claimed said cotton for the United States, gave a replevy bond, and took possession of the same.   The suit against Simeon Draper *et al.*, by the company, was removed to the United States Circuit Court, and is there pending.   Though Carswell is aware of said suit in New York, he has offered no proof, as to title, to the company.

Nevertheless, Carswell sued the company for the balance of said purchase-money.   He is aged and infirm, and has little available property, except his lands, the value of which is greatly depreciated, and the company believe he will be unable to respond upon his implied warranty of his title to said cotton.   For these reasons, stated in their bill, filed in Bibb county, the company prayed that Carswell's suit in Bibb county be enjoined until the decision of their said suit in the United States Court in New York; that if it lost this, Carswell should refund all paid by it, etc.   The bill was sanctioned.   It was demurred to, upon the grounds that there was no equity in the bill, and because Carswell, living in Wilkinson county, the Superior Court of Bibb county had no jurisdiction over him.   The Court overruled the demurrer, and retained the injunction till the end of the New York litigation.   This action of the Court is assigned as error.

Cobb & Jackson, for plaintiff in error.   The company has a complete remedy at law.   *R. M. Charlton's Ga. R.*, 497; 2 *Kelley*, (*Ga. R.*), 154, 305; 11 *Ga. R.*, 33; 19 *Ga. R.*, 134; 20 *Ga. R.*, 345; 24 *Ga. R.*, 608; 26 *Ga. R.*, 167; 30 *Ga., R.*, 170; 3 L. Cases in Eq., 184; Code, secs. 3040, 3152.   The New York suit creates no equity.   Story's C. of L., 610.a.; 9 John R., 221; 12 John R., 99; 7 Tenn. R., 470; 3 Sumner, R., 165; Code, sec. 3028.   The Superior Court of Bibb has no jurisdiction.   3 *Kelly* (*Ga. R.*), 575; 4 *Kelly*, (*Ga. R.*), 571; 12 *Ga. R.*, 77; 19 *Ga. R.*, 501; 20 *Ga. R.*, 379; 22 *Ga. R.*, 190; 23 *Ga. R.*, 415; 29 *Ga. R.*, 35, and the Constitutions of Georgia of 1861, 1865, and 1868.

J. J. & T. B. GRESHAM, B. HILL, for defendant in error, cited 23 *G. R.*, 414; 29 *Ga. R.*, 34; Code, sec. 4124, as to jurisdiction. 6 *Ga. R.*, 458; 7 *G. R.*, 384; 9 *Ga. R.*, 430; Irwin's Code, sec. 2591, and 2 John's Ch. R., 204, as to fraud. 1 Story's Eq., 82–83; 3 Atk. R., 262–3, as to multiplicity of actions, etc. 16 *G. R.*, 378; 29 *Ga. R.*, 490; and 30 *Ga. R.*, 20; 35 *Ga. R.*, 216; Code, secs. 3141–3153.

McCAY, J.

1. The constitutional provision, requiring "equity causes" to be brought in a county where one of the defendants, against whom substantial relief is prayed, resides, is to be construed in the light of the history of the law on that subject in this State.

This Court, in the case of *Gilbert vs. Thomas*, 3 *Kelly*, 575, decided that the Constitution of 1798, did not, by the words "civil cases," cover suits in equity, and that the provision therein, that all civil cases should be tried in the county of the defendant, did not, *ex vi termini*, include equity causes.

By analogy, however, to the rule thus fixed by the Constitution for civil cases, the Court then intimated that, even in equity, a party should not, without good reason, be dragged out of his county to answer a complaint. In 4 *Kelly*, 571, in the case of *Rice vs. Tarver*, this doctrine is repeated, and the general rule announced that courts of equity will, in analogy to the rule fixed for civil cases, require equity suits to be brought in a county where one of the defendants resides, unless there be some other equity, authorizing a different course.

Subsequently, in 15 *Ga. R.*, 77; 16 *Ga. R.*, 456; 18 *Ga. R.*, 678; 19 *Ga. R.* 501; 20 *Ga. R.*, 381; 21 *Ga. R.*, 454; 22 *Ga. R.*, 190; 23 *Ga. R.*, 414; 27 *Ga. R.*, 178; 29 *Ga. R.*, 34, and in some other cases, the Court, in substance, established the following propositions:

1st. That in analogy to the rule at law, equity causes must be brought in a county where a defendant resides against whom substantial relief is prayed.

2d. That this rule does not apply to bills ancillary to suits at law, as for discovery, injunction, etc.   In such causes, so far as the bill is merely defensive, and seeks no relief, outside of the suit pending, the county where the suit is pending has jurisdiction.

The Constitution of 1861, adopts the following provision : " All equity causes shall be tried in the county where one or more of the defendants reside, against whom substantial relief is prayed."   The Constitution of 1865, uses the same language.   The Constitution of 1868, is as follows:  " Equity cases shall be tried in the county where a defendant resides, against whom substantial relief is prayed."

We do not think the Constitution intends any more than this : To make a constitutional provision of what before rested in the decisions of the Courts.

In some senses, perhaps, these ancillary proceedings may be called equity causes ; but, in a striking sense, they are not. They depend upon, and are merely in aid of a common law issue.   They are necessary proceedings to get at the true rights of the parties in the matter pending in the common law tribunal.

So far as such bills are thus confined, we hold they may be brought in the county where the suit is pending.   If they seek other relief, become aggressive, instead of simply defensive, they are, so far, demurrable.   This bill seeks only to *enjoin* the common law suit in Bibb ; it asks no relief independently of that.   And we think the Superior Court of Bibb has jurisdiction for that purpose.

2d. We think the complainant sets forth good reasons why the injunction should be granted.   He alleges that he bought this cotton on the faith he had in Carswell's statements ; that, in fact, those statements were untrue ; that the United States had siezed the cotton, claiming that it was forfeited for Carswell's acts.   We do not think the fact that the proceedings are in another jurisdiction alters the case.

This company has bought this cotton, and given a note for it.   An adverse title is set up to the cotton, and the company has, on this claim, lost the possession.   Is it equitable that

the company should pay the money, until this controversy is settled? Perhaps they may lose it, even with the best defence they can make. Clearly, then, they would be entitled to recover back the very money now sought to be recovered of them.

This will be trifling with the Courts. We see no hardship in compelling Carswell, who, by the bill, is charged with deceit, and who, by his deceit, led the complainant into this difficulty, to wait for his money till it is settled. It would be to give a permission to fraud and deceit, to permit him, by such deception as this bill charges, to throw the burden of his sins upon this complainant.

It is not necessary that this bill shall allege and show that the title of the United States is good, or state, as *facts*, the ground of the adverse claim.

The bill states that the claim is *bona fide* made and prosecuted; that Carswell knew it at the sale; that he not only gave no notice of it, but did affirmative acts of deceit, to hide it, and thereby mislead the complainant. We hold this to be sufficient.

The company is entitled to the cotton, has a right to its bargain, and is not required to make out such a case here, as will show that the United States ought to recover it. Carswell has no right to put them in that position. For that reason, they do not have at present a full defence at law. At law, they would be compelled to allege and prove that the United Stated had the right to the cotton, and thus, in effect, give up the cotton; perhaps, it is worth more than when they bought it. At any rate, they have, as against Carswell, a right to the cotton, and it would be unjust to compel them, under the facts charged in this bill, either to pay this money, or, by pleading that it belongs to the United States, give up their interest in it, which, if they can succeed in their suit, may be much more than the price they agreed to pay for it. The prayer of this bill is, simply, that this suit, on the notes, may be enjoined until the termination of the proceedings instituted by the complainant to recover the cotton. The Chancellor will always have *this* proceeding in

his control.   If the suit for the cotton is not prosecuted, in good faith, and with due diligence, if it be dismissed, or there be collusion, it will be always in the power of the Chancellor to remove the bar to the common law suit.

The injunction granted by the Judge, sanctioning the bill in this case, is subject to the same proceedings as other injunctions so granted.   The defendant may answer, and if he shows there is no equity in the bill; that is, that there is no *bona fide* litigation, and no act done by him to mislead the complainant on the sale, he will be entitled, as in other cases, to have it dissolved.   There must be a decree as in other cases, and the decree, when made, should carefully protect the defendant in the bill, against any want of *bona fides* in the complainant, in the prosecution of his rights to the cotton. It should also distinctly provide that its operation should cease on the recovery of the cotton, or at the further order of the Court.

Judgment affirmed.